

**ORDERED in the Southern District of Florida on September 24, 2020.**

_____
**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                  Case No.: 19-15346-MAM

Joseph John Herrmann,                   Chapter 7

     Debtor.
_____/

Michael R. Bakst, Trustee in               Adv Proc. No.:  19-01870-MAM
Bankruptcy for Joseph John Herrmann,

     Plaintiff,

v.

Joseph John Herrmann,

     Defendant.
_____/

## MEMORANDUM OPINION AND ORDER DIRECTING
## ENTRY OF ORDER OF DISCHARGE

THIS MATTER came before the Court on May 21, 2020 at 10:00 a.m. for trial

("Trial") upon the Complaint (ECF No. 1) filed by the chapter 7 trustee, Michael Bakst

("Trustee"). In the Complaint, Trustee sought denial of Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A).[1] Despite many inconsistencies in Debtor's schedules and other factors facially suggesting that denial of discharge might be warranted, after carefully considering all evidence adduced at Trial, including the candid and credible testimony of both Debtor and his wife, the Court arrives at the opposite conclusion.

The Court therefore grants judgment on all counts in favor of Debtor and directs the Clerk to enter a standard order of discharge in Debtor's chapter 7 bankruptcy case (Case No. 19-15346-MAM) (the "Bankruptcy Case").[2]

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (J). Venue of this proceeding is properly before this Court pursuant to 28 U.S.C. §1409.

## FINDINGS OF FACT[3]

### I. General Background

Joseph John Herrmann ("Debtor"), a former United States Marine Corps veteran turned businessman, filed this Bankruptcy Case on April 24, 2019 (the

---

[1] Although the Complaint also seeks denial of discharge pursuant 11 U.S.C. § 727(a)(2)(B), Trustee later waived all claims under this subsection in his submission of proposed findings of fact and conclusion of law.

[2] To the extent that obligations remain subject to suit in a pending adversary proceeding or are subject to a pending objection to claim, the Court clarifies that this Memorandum Opinion and Order does not adjudicate liability or lack thereof as to those obligations.

[3] Prior to Trial, the parties filed the Joint Stipulation of Facts (ECF No. 13). The Court includes, without distinction, relevant stipulated facts in its Findings of Fact.

"Petition Date"). It was not his first bankruptcy filing.

A little less than ten years earlier, on October 28, 2010, Debtor filed a petition for chapter 13 relief with his spouse, Kimberly Marie Herrmann, after Debtor's brother (who at that time was also his business partner) allegedly stole his identity and accrued debt in Debtor's name. After completing all chapter 13 payments, Debtor and his wife received an order of discharge in their chapter 13 bankruptcy case on January 12, 2016.

Unfortunately, this was not the end of Debtor's struggles. A licensed residential contractor, Debtor engaged in several business ventures. One of those ventures, Hermann Brothers Enterprises ("HBE") grew very quickly. Unable to keep up with the company's explosive growth, Debtor rapidly found himself in over his head.

Debtor personally guaranteed much of HBE's debt, which ultimately wreaked havoc with his personal finances. Debtor soon found that financing his business operations with his own personal credit cards created insurmountable financial hurdles. To further complicate matters, Debtor realized that his collapsing credit threatened HBE's ability to complete outstanding construction projects for existing customers, many of whom had already provided down payments. In a last-ditch effort to salvage HBE's business operations, Debtor pursued any available business loan.

Faced with dwindling access to capital, escalating personal financial debts, and a growing list of disgruntled customers, Debtor considered filing a second personal bankruptcy. On April 5, 2019, he consulted with Stuart Young ("Mr. Young"), his

prior bankruptcy counsel. At that time, Debtor gave Mr. Young a $4,000 check[4] for potential services but asked him to hold it in case HBE was approved for another business loan and Debtor could avoid a second bankruptcy case. The terms of the prospective loan proved too onerous, however, and Debtor ultimately filed for chapter 7 relief on the Petition Date.

Debtor also filed his initial schedules and statement of financial affairs (Bankruptcy Case ECF No. 1) (the "Initial Schedules") on the Petition Date. He later amended the schedules on May 1, 2019 (Bankruptcy Case ECF No. 10), May 29, 2019 (Bankruptcy Case ECF No. 20) (the "May 2019 Schedules"), July 22, 2019 (Bankruptcy Case ECF No. 67) (the "July 2019 Schedules"), November 19, 2019 (Bankruptcy Case ECF No. 101) (the "November 2019 Schedules"), and January 2, 2020 (Bankruptcy Case ECF No. 108) (the "January 2020 Schedules").[5] Although testimony revealed that Debtor paid the remaining $2,095 of his filing and attorney's fees on the Petition Date, the May 2019 Schedules and July 2019 Schedules indicate that he paid $6,095 (not $4,000) on April 15. 2019.[6]

## II. Disputed disclosures and transfers

### A. America Home Movers, Inc.

---

[4]  Counsel for the Trustee pointed out at Trial that the check was dated April 4, 2019. Debtor testified that he was a "wreck" leading up to the filing of his bankruptcy and that he may have dated the check incorrectly by accident.

[5]  For convenience, the Court collectively refers herein to Debtor's "Schedules and Statements" as the composite of all versions filed throughout the Bankruptcy Case.

[6]  Bankruptcy Case ECF No. 20, p. 29; Bankruptcy Case ECF No. 67, p. 39.

Debtor's business history included several ventures other than HBE. He served as vice-president of one of those ventures, America Home Movers Inc. ("AHM"), and also owned 50% of the equity in the company. AHM also did business under the name "Herrmann Brothers' Moving," which became problematic when HBE (whose name differed by only one word) faced financial difficulty.

Concerned with AHM's reputation, Preet Chawla, president of AHM, sought to sever Debtor's relationship with AHM. Mr. Chawla requested that Debtor resign as vice-president from AHM and requested that Debtor execute a written resignation. Debtor complied on April 9, 2019. Although Debtor's resignation was not filed with the Florida Secretary of State until April 24, 2019, Debtor credibly testified that he understood that his resignation became effective much earlier.

Debtor earnestly believed that his written resignation as vice-president of AHM also effected a relinquishment of his equity in AHM, and that he had disclosed the transfer of his interest in AHM (the "AHM Interest") in the Initial Schedules. After his initial § 341[7] meeting with Trustee, however, Debtor realized that he failed to properly disclose his initial $5,000 capital contribution to AHM (the "Capital Contribution") and the purported transfer of his AHM Interest.[8] The Initial Schedules provided only that (i) the business existed from "8/18-present" and (ii) Debtor served

---

[7] Unless otherwise specified, all section ("§") references herein pertain to the Bankruptcy Code.

[8] The Court observes that a debtor's schedules and statements are typically prepared with the assistance of counsel. Although the source of the error is not evident from the record, the Court presumes that Debtor's counsel likewise failed to appreciate the scope of the omitted or incorrect information in the Initial Schedules and SOFA.

as "Vice President only, resigned on 4/12/19".[9] Debtor later corrected his apparent oversight in his July 2019 Schedules, by indicating he had transferred his 50% ownership interest in AHM to Mr. Chawla on April 12, 2019.[10]

Debtor further testified that while he reviewed the Initial Schedules, he is not good with paperwork, and his wife ordinarily helps him. Debtor's testimony revealed that he did not understand whether his resignation from AHM also constituted a transfer of his interest in AHM. Instead, Debtor viewed his resignation as tantamount to quitting a job.

B. Hubenko Transfers

Debtor made three transfers (the "Hubenko Transfers") totaling $17,500 to his childhood friend, Chris Hubenko ("Hubenko"): (i) $8,000 on May 21, 2018; (ii) $8,000 on July 5, 2018; and (iii) $1,500 on July 7, 2018. Debtor failed to list the Hubenko Transfers in his Initial Schedules, but later corrected his schedules to include the Hubenko Transfers. Debtor's July 2019 Schedules classified $9,500 of the Hubenko Transfers as wedding gifts. Debtor's January 2 Schedules later amended that disclosure to reflect that a $1,500 transfer was a wedding gift and simply noted that the two $8,000 transfers were "checks" to Hubenko.

Debtor looked confused when confronted at Trial regarding disclosure of the Hubenko Transfers. Appearing not to grasp the legal classification of a transfer for

---

[9] Bankruptcy Case ECF No. 1, p. 125 (Question 27).

[10] Bankruptcy Case ECF No. 67, p. 39 (Question 18).  Notwithstanding this disclosure, neither party introduced any documentary evidence of the transfer by Debtor of the AHM Interest.

which no consideration is given as a "gift", Debtor repeatedly insisted that the funds were not gifts, but instead "help" for his lifelong friend in a time of need.

According to Debtor, Hubenko had recently lost his wife to cancer and was trying to raise a young daughter with special needs. Debtor testified at length that he and Hubenko have helped each other financially throughout the years, as brothers might do. Debtor's dogged adherence to his perception of the Hubenko Transfers appeared genuine. Even after repeated questioning, Debtor remained unable to appreciate the legal nature of the Hubenko Transfers as "gifts".

By contrast, Debtor clarified that the $1,500 transfer to Hubenko was a wedding gift. He acknowledged that he inadvertently left it off his Initial Schedules and appeared apologetic. For reasons that remain unclear on the record, Debtor's disclosures of the Hubenko Transfers were inconsistent across the various iterations of the Schedules and Statements.[11]

C. <u>Additional Transfers</u>

The Complaint alleges that Debtor's initial lack of disclosure regarding three additional situations provides further evidence of intent to deceive. Debtor failed to clarify in his Initial Schedules that his wife was a co-obligor of the obligation to Aqua Finance (the "<u>Aqua Loan</u>").[12] In addition, Debtor failed to specify that HBE (not Debtor) paid $32,565 in mortgage payments (the "<u>Mortgage Payments</u>") for Debtor's

---

[11] *Compare* Bankruptcy Case ECF No. 67, p. 38 (Question 13) *with* Bankruptcy Case ECF No. 108, p. 5 (Question 13).

[12] Bankruptcy Case ECF No. 1, p. 33 (Question 4.1.2).

homestead property. Finally, Debtor did not disclose transfers totaling $10,153 to Anthony Painting (the "Painting Transfers", and collectively with the Aqua Loan and the Mortgage Payments, the "Additional Transfers"). Debtor later corrected his schedules and statements to list the Mortgage Payments as additional income from operating a business during 2018 and the Painting Transfers as payments for "Construction related work for HBE customers" during 2019.[13]

## ANALYSIS

Trustee contends that Debtor's discharge should be denied under § 727(a)(2)(A) and (a)(4)(A).[14] After carefully considering all available testimony and documentary evidence, the Court concludes that Trustee has not demonstrated that Debtor exhibited the requisite intent for each count.

I.    *Legal Standards*

a.    *Count I: Section 727(a)(2)(A)*

Bankruptcy Code § 727 requires the Court to grant a discharge unless the debtor falls outside the category of "honest but unfortunate" debtors. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (internal quotation and citation omitted). To deprive a debtor of discharge under § 727(a)(2)(A), a party must demonstrate, by a preponderance of the evidence, that the debtor transferred, removed, destroyed, mutilated, or concealed property of the estate within one year before the date of the

---

[13] Bankruptcy Case ECF No. 108, p. 2 (Question 4); *id.* at p. 4 (Question 6).

[14] Trustee waived his claim under § 727(a)(2)(B).

8

filing of the petition with intent to hinder, delay, or defraud. *Id.*; *Jennings v. Maxfield (In re Jennings)*, 533 F.3d 1333, 1338-39 (11th Cir. 2008); 11 U.S.C. § 727(a)(2)(A).

The objecting party may prove a debtor's actual, subjective intent through circumstantial evidence or inferences drawn from the debtor's course of conduct. *Jennings*, 533 F.3d at 1338-39. Indicia of fraud may include:

> (1) the lack or inadequacy of consideration for the property received;
> (2) the nature of the relationship between the transferor and the transferee;
> (3) whether the transferor retains possession, control, benefits, or use of the property in question;
> (4) whether the transfer resulted in insolvency;
> (5) the cumulative effect of the debtor's transactions and course of conduct after the onset of financial difficulties or threat of suit by creditors; and
> (6) the general chronology and timing of the transfer in question.

*Id.* at 1339 (internal citation omitted). The presence of these factors, although indicative of fraud, is not automatically dispositive, as courts construe provisions denying discharge liberally in favor of the debtor and strictly against the party seeking denial. *Id.* at 1338-39.

b.  *Count III: Section 727(a)(4)(A)*

Section 727(a)(4)(A) provides that the Court shall grant a debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account. The trustee must prove that (i) the debtor's oath or account was both knowing and fraudulent, and (ii) the oath or account was related to a material fact. *Rossi v. Dupree (In re Dupree)*, 336 B.R. 490, 494 (Bankr. M.D. Fla. 2005) (internal citations omitted). Deliberate omissions by a debtor may trigger a denial of discharge. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.

1984).

"There is a difference between a debtor who is trying to hide assets with a false oath or material omissions in his Statement of Financial Affairs, and a debtor who, through inadvertence, mistake, or ignorance of the issue of materiality in his disclosures, may omit certain assets in his original Statement of Financial Affairs." *In re Dupree*, 336 B.R. at 494. A bankruptcy court should determine whether a debtor intended to "retain assets for his own benefit at the expense of his creditors" before denying discharge. *Id*.

II.      *Analysis*

Both § 727(a)(2)(A) and (a)(4)(A) hinge upon the existence of fraudulent intent. Although the precise language employed in the two subsections is slightly different ("with intent to hinder, delay, or defraud" versus "knowingly and fraudulently"), both subsections operate to prevent a devious debtor from absconding with property of the estate legally required to satisfy the obligations of prepetition creditors.

Trustee contends that Debtor's initial failure to disclose (i) his ownership of the AHM Interest, (ii) the alleged transfer of the AHM Interest, (iii) the Capital Contribution, (iv) the Hubenko Transfers, and (v) the Additional Transfers collectively demonstrate Debtor's fraudulent intent under § 727(a)(2)(A) and (a)(4)(A). Trustee also contends that Debtor's erroneous reporting of the timing of payments to Mr. Young and multiple revisions to the schedules and statement of financial affairs provide further evidence of Debtor's fraudulent intent.

In this highly unusual Bankruptcy Case, the Court concludes that, despite

Debtor's many omissions and subsequent revisions to the Schedules and Statements, Debtor lacked the requisite intent to defraud. Debtor's testimony and conduct throughout this case leave no doubt that Debtor simply did not understand the legal and practical impact of his actions. And, for reasons unclear on the record, it appears that Debtor's counsel likewise did not appreciate the shortcomings of Debtor's initial disclosures.

*AHM*

Debtor's misconceptions regarding disclosure were particularly pronounced with respect to the Capital Contribution, the legal effect of his resignation as vice president of AHM, and the alleged transfer of the AHM Interest. Part 11, Question 27 of the Initial Schedules ("Question 27") required Debtor to indicate whether he owned any business or had an ownership or management relationship with any business within the 4 years preceding bankruptcy, and the nature of such relationship. Question 27 instructed him to check all applicable boxes directly beneath that question to specify what type of ownership interest or management relationship he held (e.g., partner, officer, owner).

In response to Question 27, Debtor checked "yes" and supplied information for HBE and AHM, along with several other entities. He neglected to check any of the boxes directly beneath Question 27, however, which raised the question of what type of ownership interest or management relationship, if any, he held in each entity prepetition. Debtor's failure to complete Schedule B, Question 19 of the Initial Schedules, which required the disclosure of ownership interests in any incorporated

and unincorporate businesses, also created an internal inconsistency in the Initial Schedules.

Debtor's testimony clarified that he believed he no longer had an interest in AHM when he signed his resignation and therefore only needed to disclose the existence of the company and his resignation date. Although it is reasonable for Trustee to assume that Debtor's counsel would have corrected this type of misunderstanding, Trustee failed to elicit testimony demonstrating that counsel did so and Debtor neglected to follow specific instruction regarding complete disclosure. In fact, the record reflects quite the opposite: whenever Trustee indicated to Debtor that a disclosure was inadequate or inconsistent, Debtor promptly took steps to rectify his Schedules and Statements by filing a supplement.

*Hubenko Transfers*

Debtor's misunderstandings also extended to the Hubenko Transfers. Debtor stressed in his testimony that the $8,000 transfers were *not* gifts because he was "helping" his friend in a time of need. Debtor did not appear to grasp that such largesse, if not a loan, constitutes a gift. Instead, he emphatically distinguished the two $8,000 transfers from the $1,500 transfer, which he acknowledged was a gift to his friend for his wedding.

Debtor was obviously contrite regarding the omission of the wedding gift. He testified credibly that he was in personal turmoil at the time of filing, leading to an innocent omission. His wife's testimony corroborated this version of events.

As to the remaining two $8,000 Hubenko Transfers, Debtor's testimony

reflected a textbook Marine Corps code of honor: if a "brother" needs help, then Debtor was obligated to provide that help. Even when faced with pointed questioning by Trustee, Debtor kept repeating that he didn't "give" the $8,000 transfers to Hubenko, he was "helping" him, much as Hubenko had allegedly helped Debtor during earlier periods.

On this point, Debtor's candor and demeanor at trial spoke volumes. He answered each question posed by Trustee forthrightly, without artifice or obfuscation. When pressed, he sought to translate or restate his response in a way that he evidently hoped would make sense. His version of events did not alter. He simply presented his version of the truth as he saw it as plainly as he could. In his mind, the Hubenko Transfers were help given to a close friend in need; nothing more, and nothing less, and, subjectively, did not constitute gifts.

### *Additional Transfers and Other Disclosures*

Debtor's explanations regarding the Additional Transfers were similarly without guile. He clarified that he did not disclose his wife's joint obligation on the Aqua Loan because he is usually the only one listed on family obligations and he simply forgot that she co-signed for that loan. Similarly, he explained that HBE made the Mortgage Payments because his accountant assured him that this was acceptable. He appeared not to understand why there was an issue with HBE paying the Mortgage Payments. His unquestioning reliance upon financial advice from an accountant (and resulting confusion regarding disclosure) was consistent with his testimony that he regularly received help with paperwork and accounting because he

13

struggled with those tasks.

Without question, Debtor's Schedules and Statements were imperfect. Despite their flaws, however, the documents collectively show that he strove for complete disclosure. When questioned about the AHM Interest, his involvement with HBE, the Hubenko Transfers, the Additional Transfers, or any other inconsistency in disclosure, Debtor dutifully added clarifying information to his Schedules and Statements by filing supplements. Although the Court questions how Debtor—who was represented by experienced counsel—was put in a position of having filed successive imprecise schedules and statements, his compliant demeanor and unabashed candor in testimony at Trial demonstrated that he did not possess the requisite intent for fraud.

The Court concludes that Debtor's failure to initially provide the level of detail in his Schedules and Statements identified by Trustee was likely attributable to a lack of professional guidance and an innocent misunderstanding of certain legal concepts, rather than an intentional desire to conceal assets. And, having arrived at this conclusion, the Court determines that Trustee failed to show, by a preponderance of the evidence, that Debtor intended to (i) hinder, delay, or defraud any creditor or Trustee, or (ii) knowingly and fraudulently make a false oath or account in connection with this Bankruptcy Case.

## **CONCLUSION**

With the Court being fully advised in the premises and for the reasons

discussed above, the Court hereby **ORDERS AND ADJUDGES** that:

1. The Court **GRANTS** judgment in favor of Debtor as to all counts of the Complaint.

2. The Clerk of Court is **DIRECTED** to enter the Court's standard order of discharge in the Bankruptcy Case.

###

Copies to:

Michael Bakst, Counsel for Trustee